2013 Ark. App. 203

**Jonathan Hersh BERKS, Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 12–478.**

Court of Appeals of Arkansas.

March 27, 2013.

Joseph C. Self, Fort Smith, for appellant.

Dustin McDaniel, Att'y Gen., by: Kent G. Holt, Ass't Att'y Gen., for appellee.

RITA W. GRUBER, Judge.

Appellant Jonathan Berks was convicted by a jury of second-degree murder and aggravated residential burglary in connection with the beating death of his neighbor, Wallace Taylor. The jury recommended consecutive sentences of thirty years' imprisonment on each count, which the trial court imposed. On appeal, appellant contends that the trial court erred in (1) denying his motion for directed verdict; (2) certifying a witness as an expert without conducting a *Daubert/Foote* hearing; (3) denying his motion in limine to exclude the finding that sexual-abuse allegations he made against the victim were unsubstantiated; and (4) allowing DNA evidence over his objection that it was untimely. We find no error and affirm the trial court's order.

On April 16, 2010, police and emergency medical technicians were dispatched to Wallace Taylor's home in Hot Springs Village after Jean McCarthy called 911 from his home. Ms. McCarthy testified that she and Mr. Taylor had been dating since January 2010 and had planned to go to a party that day. When Mr. Taylor did not pick her up at 4:15 as planned, she drove to his house. She testified that the garage was open, the grill was out front, and the door was ajar. She went in, found Mr. Taylor unresponsive and lying on the kitchen floor, and called 911. She said that there was blood all over the phone.

Daniel Stramp, a paramedic, testified that he arrived at Mr. Taylor's home at 4:51 p.m. on April 16, 2010. He said that he noticed a ladder lying on the floor of the garage when he arrived. He went inside and saw Mr. Taylor on his back in the kitchen, looking very sick. Matthew Boyd, a Hot Springs Village police officer, testified that when he arrived at Mr. Taylor's home, he saw the paramedics working on Mr. Taylor, who was lying on the kitchen floor wearing only a pair of boxer shorts. He said that Mr. Taylor was bruised on his face and head and that there was blood on the carpet and the floors in the house. Officer Boyd said that Mr. Taylor's face was covered in dried blood, his eyes were swollen and black and blue, he had a large abrasion on his chest, and he had trouble breathing. He testified that Mr. Taylor's heart stopped while the ambulance was en route to the hospital.

Brian Nickles, a sergeant with the Hot Springs Village Police Department, testified that he arrived at Mr. Taylor's home after the paramedics had taken Mr. Taylor to the hospital. He said that he saw blood on the floor in the hallway, the living room,

the laundry room, and the half-bath. He also saw blood on the sink and the counter-top, near the toilet, and on the walls in the bathroom. He said that he discovered a broken watch with what he suspected was blood on it on the floor and a yellow tank top with suspected blood stains in the den. The tank top was bagged, sealed, and eventually sent to the Arkansas State Crime Lab to determine |₃if the stains on the shirt were blood stains and to deter-mine what made the pattern that was found on the shirt. Sergeant Nickles tes-tified that when appellant's tennis shoes were eventually discovered and brought to the police department, he noticed that the pattern on the top of the Asics-brand shoe matched the pattern of the impression on the tank top. In the formal living room, he observed "quite a bit of blood," a hear-ing aid covered in blood, and a pair of glasses that were bent and had blood on them. There was also blood spatter on the wall and on two glass display cabinets. He said that there was blood on the coffee table and that the table appeared to have been displaced. It also looked like the display cabinets had been bumped.

A friend of appellant's, Stephen Robin-son, testified that appellant had told him that Mr. Taylor had molested appellant's three kids and that he wished "someone would beat him up." Mr. Robinson said that, on the day after the murder, he and appellant saw each other at the home of mutual friends. They left the friends' house to go for a ride and drink some beers. Mr. Robinson said they first went to appellant's house, where appellant re-trieved a white garbage bag that he put in the trunk. Then they drove to a small side road, and appellant asked Mr. Robin-son to stop the car so he could use the restroom. Once they were stopped, appel-lant asked him to open the trunk. Mr. Robinson said he saw appellant dipping a pair of shoes in the nearby creek and he

asked appellant what he was doing. Ap-pellant told him not to worry about it and said that he had "beat up somebody pretty good." Mr. Robinson said that appellant was "freaking out" and "sweating like cra-zy." Appellant threatened to kill Mr. Rob-inson's mom if he said anything. He testi-fied that appellant came |₄by his house the next day and said, "Are we good? . . . Don't snitch on me, man." Mr. Robinson said, "You really beat him up kinda bad?" Appellant answered, "Yeah. I beat him up pretty good. I beat the hell out of him, yeah." Mr. Robinson gave a statement to the police and took the police to the creek where appellant had left his shoes.

Leonard Livesay, the realtor who sold appellant his home in Hot Springs Village in January 2009, testified that appellant introduced him to Wallace Taylor in July 2009. He explained that appellant and Mr. Taylor had been friends in Minnesota and that Mr. Taylor stayed with appellant for three weeks while he looked at homes. Mr. Taylor bought a home across the street from appellant's home. Mr. Livesay testified that both appellant and Mr. Tay-lor called him in early 2010 and expressed the desire to sell their homes and move away from each other. He said that he told both of them that it would have been a bad financial decision to sell at that point. Mr. Livesay testified that he went to din-ner with appellant on April 5, 2010, and appellant said that his wife and children were gone for the week. Appellant looked at Mr. Taylor's house when Mr. Livesay was backing his car out of appellant's driveway on the way to dinner, and appel-lant said, "I might just have to kill him." In addition, several friends of Mr. Taylor, one whom Mr. Taylor had known for sev-enteen years in Minnesota and one he knew in Hot Springs Village, testified that Mr. Taylor had recently expressed a fear of appellant.

The shoes from the creek were submitted to the crime lab for analysis, and partial DNA profiles were obtained from cuttings taken from each shoe. The results indicated that appellant's DNA was on the shoes. Jennifer Beaty, a forensic DNA examiner for the Arkansas State Crime Lab, testified that the probability of selecting an individual at random from the general population having the same genetic markers on the cutting from the right shoe and appellant was 1 in 1,132,000 and on the cutting from the left shoe and appellant was 1 in 1,164,000 in the Caucasian population.

Bobbie Humphries, the chief latent examiner for the Arkansas State Crime Lab, was qualified as an expert in latent prints and the sub-area of shoe prints over appellant's objection. He testified that the yellow tank top and the Asics tennis shoes found in the creek were submitted to him to examine. He determined that transfer impressions on the shirt were consistent with and could have been made by the shoes submitted. He testified that the pattern had to have been made by an Asics shoe with the same pattern, but he could not exclude other Asics shoes of the same type, make, size, and design. On cross-examination, he said that he could not state what size or style Asics made the impression.

Stephen Erickson, the deputy chief medical examiner at the Arkansas State Crime Lab, performed the autopsy on Mr. Taylor. He testified that there were numerous blunt-force injuries to the head and face. He said that the severity of the injuries was consistent with a prolonged assault. He also discovered two rectangular-pattern injuries on the right flank of Mr. Taylor's abdomen, in addition to scrapes, bruises, and abrasions on the forearms and knees, consistent with a fall. Dr. Erickson opined that Mr. Taylor died from a sub-dural hematoma to the brain caused by blunt-force injury and that the manner of death was homicide. He testified that he could directly relate the external evidence of assault from the police investigation to his internal physiological finding of the cause of death, the subdural hematoma.

Finally, Anthony Jones, who shared a jail cell with appellant for about three weeks, testified that appellant told him that he had beaten someone to death, that he had burned his clothes in a barbeque pit in the park ground, and that he had dumped his tennis shoes in a creek where they would never be found. Mr. Jones said that, although he did not remember appellant giving him the victim's name, appellant told him that he and the victim had been friends in Minnesota and that he had gotten the victim to move to Hot Springs Village. Appellant told Mr. Jones that the victim had touched his children and that the victim would never touch another child. Appellant said that he had kicked, kneed, and elbowed the victim and that he had used a Baby Ruth mini-slugger, which he threw into the river next to the police department.

A jury convicted appellant of second-degree murder and aggravated residential burglary. Appellant brings four points on appeal.

■ For his first point, appellant argues that the trial court erred in denying his motions for directed verdict on both counts because the proof was ambiguous regarding whether Mr. Taylor's death was caused by another person and because the only evidence placing appellant in Mr. Taylor's home was a shoe imprint found on a tank top in the home. Appellant points to testimony that a ladder was lying on the floor of the garage, suggesting that Mr. Taylor could have fallen. He also points to Dr. Erickson's admission that he could not ex-

clude the possibility that the blunt-force injuries were caused by falling.

When the sufficiency of the evidence is challenged, we consider only the evidence that supports the verdict, viewing the evidence in the light most favorable to the State. *LeFever v. State,* 91 Ark.App. 86, 89, 208 S.W.3d 812, 815 (2005). The test is whether there is substantial evidence to support the verdict, which is evidence that is of sufficient force and character that it will, with reasonable certainty, compel a conclusion one way or another. *Harris v. State,* 72 Ark.App. 227, 232, 35 S.W.3d 819, 822–23 (2000). Witness credibility is an issue for the factfinder, who is free to believe all or a portion of any witness's testimony and whose duty it is to resolve questions of conflicting testimony and inconsistent evidence. *Baughman v. State,* 353 Ark. 1, 5, 110 S.W.3d 740, 743 (2003).

Although the jury might have determined that Mr. Taylor's injuries were caused by a fall, it did not. There was ample testimony and evidence that Mr. Taylor's death was caused by a prolonged assault and that appellant was the perpetrator. The investigating officers and the paramedics testified that the contents of the home had been disturbed, that there was blood all through the house, and that Mr. Taylor's broken glasses, watch, and hearing aid were found on the floor. Dr. Erickson opined that Mr. Taylor's death was a homicide caused by blunt-force trauma to his head. DNA evidence indicated that the shoes that were later determined to have been imprinted on Mr. Taylor's bloody shirt were appellant's. Several witnesses testified that Mr. Taylor was afraid of appellant. Several witnesses testified that appellant mentioned harming Mr. Taylor before he was killed. Mr. Jones and Mr. Robinson testified that appellant told them he had beaten someone and gave

specific details. Considering only the evidence that supports the verdict and viewing the evidence in the light most favorable to the State, we hold that substantial evidence supports the jury's verdict.

Appellant next contends that the trial court erred in certifying Mr. Humphries as an expert witness without conducting a *Daubert/Foote* hearing. In *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the United States Supreme Court set forth the parameters a trial court should consider in determining the admissibility of scientific evidence under the Federal Rules of Evidence. The Court rejected the long-used test from *Frye v. United States,* 293 F. 1013, 1014 (1923), pursuant to which only expert opinions that were based on a scientific technique that was "generally accepted" as reliable in the relevant scientific community were admissible. The Arkansas Supreme Court adopted the reasoning of *Daubert* for evaluation of scientific evidence under the Arkansas Rules of Evidence in *Farm Bureau Mutual Ins. Co. v. Foote,* 341 Ark. 105, 14 S.W.3d 512 (2000). Rule 702 of the Arkansas Rules of Evidence provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." Under *Daubert* and *Foote,* the trial court must make a preliminary assessment of whether the reasoning or methodology underlying expert testimony is valid and whether the reasoning and methodology used by the expert has been properly applied to the facts of the case. *Coca–Cola Bottling Co. of Memphis v. Gill,* 352 Ark. 240, 262, 100 S.W.3d 715, 729 (2003).

In determining when a *Daubert/Foote* analysis is necessary in a particular case, the Supreme Court's reasoning in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)—in which the Court held that the trial judge's basic gatekeeping function imposed in *Daubert* applies to all, and not just scientific, expert testimony—is helpful. The Court emphasized that the trial court has broad latitude in determining the reliability of an expert's testimony and that the *Daubert* factors may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. The Court discussed the objective of the trial judge's gatekeeping requirement as follows:

> The objective of that requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field. Nor do we deny that, as stated in *Daubert*, the particular questions that it mentioned will often be appropriate for use in determining the reliability of challenged expert testimony. Rather, we conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.
>
> The trial court must have the same kind of latitude in deciding *how* to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability, as it enjoys when it decides

*whether or not* that expert's relevant testimony is reliable. Our opinion in *[General Electric Co. v.] Joiner* [522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) ] makes clear that a court of appeals is to apply an abuse-of-discretion standard when it "review[s] a trial court's decision to admit or exclude expert testimony." 522 U.S. at 138–139, 118 S.Ct. 512, 139 L.Ed.2d 508. That standard applies as much to the trial court's decisions about how to determine reliability as to its ultimate conclusion. Otherwise, the trial judge would lack the discretionary authority needed both to avoid unnecessary "reliability" proceedings in ordinary cases where the reliability of an expert's methods is properly taken for granted, and to require appropriate proceedings in the less usual or more complex cases where cause for questioning the expert's reliability arises. Indeed, the Rules seek to avoid "unjustifiable expense and delay" as part of their search for "truth" and the "jus[t] determin[ation]" of proceedings. Fed. Rule Evid. 102. Thus, whether *Daubert's* specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine.

*Kumho Tire Co.*, 526 U.S. at 152–53, 119 S.Ct. 1167.

Finally, we have continued to maintain that trial courts have broad discretion in ruling on the admissibility of scientific evidence, and we will not reverse the trial court's ruling on the admissibility of evidence absent an abuse of that discretion. *Green v. Alpharma, Inc.*, 373 Ark. 378, 397, 284 S.W.3d 29, 43 (2008). In the case before us, Mr. Humphries opined on the imprint found on a yellow tank top in Mr. Taylor's house. He testified that he was the chief latent examiner for the Arkansas

State Crime Lab; that he had received his latent-print certification in 1996; that he had attended numerous seminars, schools, and workshops on latent prints and on tire and shoe-pattern impressions; that he had been certified as an expert in the courts of Arkansas (including the subject area of latent prints and the sub-area of shoe prints); and that all shoe and tire impressions that come to the Arkansas State Crime Lab come to his department. He described the methodology he used—photographs and overlay documentation—in comparing the recovered tennis shoes and the bloody imprint he found on the shirt. We hold that the trial court did not abuse its discretion in its decision not to conduct a hearing to determine the admissibility of Mr. Humphries' testimony or in its decision to admit this testimony.

■ For his third point on appeal, appellant argues that the trial court abused its discretion in admitting the resolution of his sexual-abuse allegations against Mr. Taylor. Appellant had filed an allegation of sexual misconduct with his children against Mr. Taylor in January 2010, less than three months before Mr. Taylor's death. After conducting an investigation of the allegations, the Crimes Against Children Division of the Arkansas State Police concluded on February 26, 2010, that the allegations were unsubstantiated. Appellant claims that the admission of this conclusion was highly prejudicial to him and that the evidence should have been excluded as not relevant or, under Rule 403 of the Arkansas Rules of Evidence, because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading of the jury.

■ The trial court has broad discretion in evidentiary rulings, and this court will not reverse a trial court's ruling on the introduction of evidence unless it has abused that discretion. *Williams v. State,* 2011 Ark. App. 675, at 8, 386 S.W.3d 609, 614. Where the purpose of evidence is to disclose a motive for a killing, anything that might have influenced the commission of the act may be shown. *Gaines v. State,* 340 Ark. 99, 108, 8 S.W.3d 547, 553 (2000). Evidence of circumstances that explain the act, show a motive, or illustrate the accused's state of mind may be independently relevant and admissible. *Id.* The circumstances surrounding appellant's allegations against Mr. Taylor and his state of mind regarding those allegations were relevant to show motive in this case. We hold that the trial court did not abuse its discretion in admitting this evidence.

■ Finally, appellant contends that the trial court abused its discretion in denying his motion to exclude the DNA evidence obtained from the tennis shoes. DNA testing of the tennis shoes was mistakenly delayed, and a report was not issued until several days before trial. On the day of trial, appellant orally moved to exclude the evidence because he did not have time to conduct his own analysis of the evidence. Once again, we review a trial court's evidentiary decisions for an abuse of discretion. *Williams,* 2011 Ark. App. 675, at 8, 386 S.W.3d at 614.

At a pretrial hearing on October 17, 2011, the State recognized that the DNA evidence had been mistakenly delayed and stated that if the defense wanted to move for a continuance, the State would have no objection. Appellant made no motion at that time, nor did he move for a continuance at the pretrial hearing on October 24, 2011, two days before trial, although the results from the DNA tests were in. Moreover, although appellant knew that the shoes were being tested, appellant never sought his own expert nor filed a motion for continuance in spite of the State's willingness to accede to a continuance. We

hold that the trial court did not abuse its discretion in denying appellant's request to exclude this evidence.

Affirmed.

VAUGHT and HIXSON, JJ., agree.