Cite as 2021 Ark. App. 71

# ARKANSAS COURT OF APPEALS
DIVISION I

No. CV-19-68

| | |
|---|---|
| ENTERGY ARKANSAS, INC., AND ENTERGY OPERATIONS, INC. | **Opinion Delivered:** February 17, 2021 |
| APPELLANTS | APPEAL FROM THE POPE COUNTY CIRCUIT COURT [NO. 58CV-13-166] |
| V. | |
| SUSAN ALLEN, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF WADE WALTERS, DECEASED | HONORABLE DENNIS CHARLES SUTTERFIELD, JUDGE |
| APPELLEE | AFFIRMED |

## RAYMOND R. ABRAMSON, Judge

This case is one of several that arose from an accident that occurred at Entergy's Arkansas Nuclear One ("ANO") plant in Russellville on March 31, 2013. A temporary crane failed as it lowered one of the plant's decommissioned main turbine generator stators onto a transport vehicle that was parked one story below, in the facility's train bay. The stator, which weighed over five hundred tons, fell approximately thirty feet. Several iron workers and carpenters were working below the crane when it failed. Eight of them were injured as fragments of the crane fell to the ground. Ronnie Francis sustained injuries as he attempted to help a man who had become trapped under one of the beams of the fallen crane. Twenty-four-year-old Wade Walters was killed.

Susan Allen, the plaintiff in the case below, is Wade Walters's mother and the administratrix of his estate. Following the accident, Ms. Allen, Mr. Francis, and at least three

other plaintiffs filed separate lawsuits in the Pope County Circuit Court against Entergy and several contractors that were involved in the stator-lift project. One of those contractors, Bigge Power Company ("Bigge"), supplied the crane that failed.

Events that occurred in Mr. Francis's lawsuit are significant here. In that case, Bigge propounded interrogatories to Entergy that requested reports of the root-cause evaluation that Entergy performed in the aftermath of the accident. Entergy objected, and Bigge filed a motion to compel. Entergy sought an order of protection, arguing that the work-product rule and attorney-client privilege protected the reports from disclosure. The circuit court denied an order of protection and directed Entergy to provide the reports to Bigge and to Mr. Francis, who had joined Bigge's motion to compel.

Entergy filed an interlocutory appeal, *see Entergy Ark., Inc. v. Francis*, 2018 Ark. App. 250, 549 S.W.3d 362, and this court affirmed the circuit court's order in part and reversed it in part. We held that the circuit court did not abuse its discretion by denying the order of protection and by ordering Entergy to produce the reports to Bigge. We reversed the order, however, insofar as it ordered Entergy to produce the reports to Mr. Francis. We held that Mr. Francis had not served Entergy with interrogatories or requests for production and therefore did not have standing to join Bigge's motion to compel. *Id*. at 13, 549 S.W.3d at 370.

The issue in this appeal is whether the *Francis* decision should have any bearing on the course of discovery in Allen's lawsuit, where Entergy again asserted that the root-cause evaluation reports were protected by attorney-client privilege and the work-product rule. The circuit court granted Allen's motion to compel Entergy to produce the reports finding

2

that *Francis* was law of the case that precluded any further consideration of Entergy's claims that they were privileged.

Entergy has now filed another interlocutory appeal challenging the circuit court's order. We affirm because the circuit court did not abuse its discretion when it determined that *Francis* has a preclusive effect on Entergy's renewed assertions of privilege.

I. *Facts and Procedural History*

A. The Accident and Subsequent Internal Investigation

Several of the facts that we recounted in *Francis* bear repeating here. In 2011, Entergy contracted with Siemens Energy, Inc. ("Siemens"), to remove and replace one of ANO's main turbine generator stators, which, powered by steam from the plant's nuclear reactor, generated the electricity produced at the plant. Siemens subcontracted with Bigge for temporary crane and rigging services to remove the original stator and install its replacement. The temporary crane was intended to lift the stator from its mooring on the plant's main turbine deck, carry it several feet to the train-bay opening, and then lower the stator onto a transport vehicle that waited below.

The stator lift began at approximately 7:40 a.m. on Sunday, March 13, 2013. After the lift was underway, the workers who were supervising the lift realized that the stator would not clear a guardrail at the opening of the train bay. Several iron workers, including Mr. Francis and Mr. Walters, were called in to remove the guardrail while the stator lift was in progress. Shortly after the guardrail was removed, the temporary crane failed, and the stator, as well as pieces of the crane, fell to the main turbine deck and through the train-bay

3

opening. As indicated above, several of the workers standing by, including Mr. Francis, were injured in the accident. Mr. Walters was killed.

Entergy immediately began an internal investigation, or root cause-evaluation, of the accident. The root-cause evaluation was required by the Nuclear Regulatory Commission ("NRC") and Entergy's internal policy, and its purpose was to identify and determine the cause(s) of "conditions adverse to quality" and to document the "corrective action taken to preclude repetition."

Entergy issued its first root-cause evaluation report on July 22, 2013. The report concluded that the root cause of the stator drop was the crane's defective design, which did not ensure that the crane "could support the loads anticipated for the lift." The report also found, as an additional root cause, that Bigge, which designed and furnished the crane, "failed to perform required load testing of their [crane] prior to its use at ANO in accordance with OSHA regulation." The report further concluded, in pertinent part, that Bigge and Siemens contributed to the accident by "inaccurately represent[ing] that the [crane] had been used at other electric power stations to lift components that exceeded the anticipated weight of the . . . stator," and Siemens failed "to provide adequate oversight and control of Bigge's performance."

The NRC later observed, during its own inspection of the ANO facility, that the July 2013 root-cause evaluation was not adequate. Specifically, the report "did not address Entergy's oversight of the contractors involved with the stator lift," and the NRC inspectors further determined that "Entergy did not ensure adequate supervisory and management oversight of the contractors and other supplemental personnel involved with the stator lift,

4

and this contributed to the event." Consequently, on December 10, 2014, Entergy issued its second root-cause evaluation that identified additional root causes of the accident, including that the project "was not organized or managed in a manner that provided sufficient oversight of the vendor's design and testing for the [crane]" and that Entergy's internal procedures "provided insufficient guidance to identify and manage risk items with high consequence, particularly where the probability of the event was judged to be very low." The second root-cause evaluation also found that Entergy's "[w]eak implementation of administrative controls"; Entergy's failure to provide "clear guidance regarding the level of review required to approve the design and testing of vendor-supplied special lift equipment"; Entergy's "undue confidence in the vendor's capabilities"; and the inadequacy of a prior corrective-action plan were contributing causes of the accident.

## B. *Entergy v. Francis*

Mr. Francis filed a complaint on November 21, 2013, alleging several claims of negligence against Entergy, Siemens, Bigge, and other contractors associated with the stator-lift project.

On August 15, 2014, Bigge propounded seventy-nine interrogatories and sixty-four requests for production on Entergy. The discovery sought documents and information for a separate property-damage case that Entergy had filed against Bigge and other subcontractors as well as for Bigge's cross-claims against Entergy in the *Francis* case. Among other things, the requests for production sought "all documents relating to or referring to [y]our post-accident investigation[,]" including the first root-cause evaluation report and twenty-one other specific documents.

5

On October 30, 2014, Entergy provided responses and objections to the interrogatories and requests for production. Entergy responded that "Entergy's counsel directed a root cause team that investigated the March 31, 2013, incident," but otherwise objected to the interrogatories and requests for production regarding its internal investigations "to the extent that it [sought] information protected by the attorney-client privilege or attorney work product privilege."

Bigge filed a motion to compel Entergy to respond to the interrogatories and requests for production on December 18, 2014. Shortly thereafter, on January 20, 2015, Mr. Francis filed a "motion in support" of Bigge's motion to compel requesting that the circuit court grant Bigge's motion. Entergy responded asserting that the motion should be denied because the motion to compel was without merit, and in any event, Mr. Francis did not have standing to join the motion to compel because he was not a "discovering party" under Ark. R. Civ. P. 37(a).

Approximately eighteen months later, on or about October 16, 2016, Entergy provided supplemental responses and objections to the interrogatories and requests for production, delivering several thousand more documents. Entergy's responses regarding its internal investigations did not materially change, and to that point, it had produced only a heavily redacted version of the first root-cause evaluation.[1] Consequently, Bigge filed a supplement to its motion to compel on January 3, 2017, in which it argued that Entergy

---

[1]The first root-cause evaluation report is a 190-page document. Entergy redacted 160 pages, and through a confidentiality agreement with the NRC, only the redacted version of the report is publicly available.

should be compelled to produce "documents it has in its possession related to . . . pre-stator drop risk assessments and the Stator Drop Root Cause Evaluation records."

The root-cause evaluations came into sharper focus during a series of events that followed the filing of Bigge's supplemental motion to compel. First, on February 2, 2017, as a court-ordered mediation approached, Mr. Francis's counsel wrote a letter to the circuit court, apparently in response to a letter he received from the circuit court on January 31, 2017. Counsel wrote, in pertinent part, that "Ronnie Francis requests the Court rule one document be produced before the Court-ordered mediation," and explained that

> [t]he Nuclear Regulatory Commission (NRC) caused Entergy to prepare a Stator Drop Root-Cause Evaluation. Entergy did so. Bigge served Entergy with interrogatories and requests for production to produce the Stator Drop Root-Cause Evaluation. Entergy objected and produced the 190-page document with approximately 160 pages of the document redacted. . . . Ronnie Francis joined in Bigge's motion to compel on January 20, 2015.

The circuit court subsequently set a hearing on this request for February 28, 2017.

Nearly two weeks after Mr. Francis requested the hearing, on February 14, Neil O'Keefe, who was a chief in the NRC's Division of Reactor Projects, was deposed. Mr. O'Keefe explained the circumstances of the two root-cause evaluations stating that Entergy's first root-cause evaluation report failed to address its own "performance deficiency," which the NRC found during its own postaccident inspection. According to Mr. O'Keefe, Entergy failed to properly "oversee the people who . . . were actually performing the activities during the stator lift," and that failure, itself, was a "significant condition adverse to quality" that required a second root-cause evaluation. Mr. O'Keefe further explained that the first root-cause report

7

simply focused on . . . the technical reason as to why the stator fell and cause[d] damage and why the contractors and subcontractors failed, and the second root cause report was why Entergy allowed that to happen, [and] failed to provide the kind of oversight that would result in a safe outcome, and what Entergy might have done to prevent the drop.

Mr. O'Keefe also explained that the NRC simply "did not have all of the facts," and Entergy, as its licensee, was "required to perform a root cause analysis and create the rest of the set of facts."

On February 24, 2017, Entergy filed a motion for a protective order, arguing that it should not be compelled to disclose the redacted portions of the first root-cause analysis report as Mr. Francis requested in the letter that he wrote to the circuit court on February 2, 2017. Entergy asserted, as it had previously, that Mr. Francis had no right to seek the report because he was not a "discovering party" under Ark. R. Civ. P. 37(a)(2).[2] Entergy further argued that, in any event, the root-cause evaluation report was protected by the work-product rule and attorney-client privilege because it was prepared in anticipation of litigation. As proof of the latter point, Entergy submitted a preservation-of-evidence letter from counsel representing Allen, which it received just a few days after the accident, as well as an affidavit from Timothy Matthews, Entergy's outside counsel, who averred that he oversaw the root-cause investigation.

On February 28, 2017, the circuit court held a hearing to determine whether the root-cause evaluations were protected by the work-product rule and the attorney-client

---

[2]In relevant part, Rule 37(a)(2) provides that "if a party, in response to a request for inspection . . . fails to permit inspection [of documents] as requested . . . the discovering party may move for . . . an order compelling inspection in accordance with the request."

privilege. Mr. Francis and Bigge argued that the reports were not work product because they would have been prepared even in the absence of litigation pursuant to Entergy's internal policy and NRC regulations. Bigge also argued that, in any event, Entergy waived work product and attorney-client privilege when it published the results of the first root-cause evaluation in its industry publication, *the Navigator.* In response, Entergy argued that the reports were indeed prepared in anticipation of litigation but also acknowledged that it "would have done [them] anyway." Entergy further argued that its disclosure of the results of the first root-cause evaluation did not constitute a waiver of either privilege because *the Navigator* is an internal document whose distribution was limited to Entergy's employees and contractors. The circuit court ruled from the bench that it was going to "grant the motion" and order that "the information should be given over to Francis and Bigge."

The circuit court entered its order requiring disclosure of the root-cause evaluations to "all parties" on March 13, 2017. The court found that Entergy's policy provided that a root-cause investigation "is a process used to evaluate the possible contributors to an event in order to develop corrective actions to preclude repetition of the same or similar events," and Entergy's procedures for conducting such investigations did not "reference the potential for litigation." The circuit court also found that Entergy admitted "that it would have performed the root-cause investigation absent litigation," and "it does not always need attorneys present to perform a root-cause analysis." Consequently, the circuit court ruled that root-cause evaluation reports "were not prepared in anticipation of litigation and, therefore, are not subject to work-product protection or attorney-client privilege." The circuit courts also alternatively ruled that "Entergy waived work product immunity and

9

attorney-client privilege when it distributed the conclusions of the first root cause analysis in an intra-company newsletter."

Pursuant to Rule 2(f) of the Arkansas Rules of Appellate Procedure–Civil, Entergy obtained our supreme court's permission to pursue an interlocutory appeal of the circuit court's order. The case was administratively transferred to this court, and Entergy argued here that the circuit court erred in at least two respects. First, Entergy contended that the circuit court erred by ordering disclosure to "all parties" because Mr. Francis, who had joined Bigge's motion to compel, did not propound any of his own discovery seeking the root-cause evaluation reports and therefore lacked standing. Second, Entergy argued that the circuit court abused its discretion when it found that the work-product rule and the attorney-client privilege did not protect the reports from disclosure. According to Entergy, the reports that it prepared in the aftermath of the stator-lift accident were of a different nature than others that it had prepared in the ordinary course of business. These reports, Entergy said, "were larger and more complex, were overseen by counsel, and were conducted when litigation was certain to occur." *Francis*, 2018 Ark. App. 250, at 16–17, 549 S.W.3d at 371.

This court affirmed in part and reversed in part. We agreed that Mr. Francis did not have standing to join Bigge's motion to compel and therefore reversed the circuit court's order to the extent that it ordered production of the root-cause evaluation reports to Mr. Francis. However, we rejected Entergy's argument that the root-cause evaluation reports were entitled to work-product protection, observing that "[i]t [was] undisputed that Entergy would have performed the root-cause evaluations even in the absence of litigation, as

10

required by its own policy and by the Nuclear Regulatory Commission." *Id.* at 16, 549 S.W.3d at 371. The court was also unpersuaded by Entergy's contention that the root-cause evaluations of the stator-lift drop were more complex than those it prepared in the ordinary course of business, saying as follows:

> The party asserting work-product privilege has the burden of proving its application, and Entergy failed to timely offer the evidence that, in its view, establishes that the root-cause evaluations following the stator-drop incident were prepared outside the ordinary course of business. As an initial matter, there is no unredacted version of the first report in the record to allow the circuit court—or this court—to evaluate that claim, and there is no version of the second report—redacted or otherwise—in the record at all. Further, as indicated above, Entergy submitted two substantially different affidavits from Entergy's outside counsel, Timothy Matthews. The first affidavit did little more than establish that counsel was involved in the first root-cause evaluation that was otherwise performed in the ordinary course of business. The second affidavit went to greater lengths to distinguish both root-cause evaluations from those that are more "routine," but it was not presented in a format that allowed the circuit court to consider it. Indeed, Entergy submitted the second affidavit in a reply to Francis's response to Entergy's motion for protective order only after the circuit court entered its order denying the motion. Entergy did not request reconsideration of the discovery order based on the new information in the second affidavit. Therefore, Entergy cannot use the second affidavit now to demonstrate that the circuit court [abused its discretion].

*Id.* at 17–18, 549 S.W.3d at 372. The supreme court denied Entergy's petition for review on June 21, 2018, and the clerk issued the mandate on that date.

## C. *Entergy v. Allen*

The day after the mandate issued in *Francis*, Allen's counsel sent a letter requesting that Entergy "immediately provide complete, unredacted copies of both root-cause analyses." The letter asserted that the information "should be produced under Plaintiff's first set of interrogatories and requests for production in the *Francis* case, as well as to Bigge per the Court of Appeals' opinion." Counsel also asserted that Bigge's settlement with the

11

plaintiffs should be no impediment to production of the information because "at the insistence of Entergy and Siemens, Bigge remains as a party for purposes of the cross-claims for contribution." The letter closed by warning that Allen will file "an emergency motion to compel" if Entergy did not produce the root-cause evaluation reports by close of business Monday, June 25, [2018]."

Entergy declined to produce the root-cause evaluation reports and asserted that *Francis* did not require production for two reasons. First, "the Court of Appeals' decision determined that the circuit court's opinion should be affirmed only in part, and that was as to Bigge, not Mr. Francis," and "Entergy's discovery dispute with Bigge—which led to the appellate proceedings in the first place—is now moot due to Bigge's dismissal." Second, Entergy contended that the opinion in *Francis* "was entirely based upon a theory that Entergy waived the various arguments raised in its appeal or failed to timely offer evidence in support of such arguments"; therefore, "[t]here is no 'mandate' to produce the two root cause reports based upon a substantive discussion of the actual merits of Entergy's arguments." Entergy concluded by writing, "As such, Entergy will not produce the two root cause reports, but will instead—in response to your emergency motion to compel—raise the very arguments that the Court of Appeals did not consider on appeal."

Allen thereafter filed a motion to compel pursuant to Ark. R. Civ. P. 37. In the motion, Allen argued that the court's decision in *Francis* already settled that the root-cause evaluation reports could not be protected as work product. Allen also argued that Bigge's dismissal from the lawsuit was no impediment to production of the root-cause evaluation reports because the circuit court entered a stipulated order on February 22, 2017, requiring

12

that documents produced in one lawsuit be provided to all parties in all of the stator-drop lawsuits. Allen argued, therefore, that "Entergy's refusal to supplement its discovery and produce the unredacted root cause reports to [Allen] violates both the mandate and the stipulated order concerning discovery."

In response, Entergy argued once again that the root-cause evaluation reports were protected by the attorney-client privilege and the work-product rule. Regarding the work-product rule, Entergy reiterated that the reports met its threshold requirement—that they were created in anticipation of litigation—because they were prepared with the assistance of counsel and were larger and more complex than root-cause evaluation reports it had previously created in the ordinary course of business. Entergy also asserted that the root-cause evaluation reports were not required by the NRC, and it attached affidavits purporting to demonstrate that Entergy undertook the root-cause evaluations of its own volition following the stator-drop accident.

On January 8, 2019, the circuit court entered an order granting Allen's motion to compel and ordering Entergy to produce unredacted versions of the root-cause evaluation reports. The court rejected Entergy's renewed claims of attorney-client privilege and work-product protection, noting that "the question of whether the [reports] are privileged documents was subject to a prior appeal" in which Entergy also claimed that the reports were prepared in anticipation of litigation. Therefore, the circuit court declined to address or reconsider Entergy's assertions of privilege because its prior determination "that no such privilege exists, as affirmed by the Arkansas Court of Appeals, is law of the case." The circuit court likewise refused to consider the new evidence that Entergy submitted to support its

assertion of privilege "because doing so would exceed the [appellate] mandate, which would exceed the Court's jurisdiction."

Entergy asked the circuit court to reconsider its order, arguing that, among other things, the circuit court erred by applying the law-of-the-case doctrine to preclude Entergy's renewed assertions of privilege. According to Entergy, "[l]aw of the case does not apply when the adverse parties . . . are different on remand," and it was "undisputed that the appellate decision ordering production of the reports considered arguments [only] between Entergy and Bigge." Entergy further argued that the circuit court should have considered the "wealth of new evidence" that it presented below as well as Bigge's dismissal from the case, which Entergy alleged was a "material change in facts" since this court decided *Francis*. The circuit court denied the motion for reconsideration on January 22, 2019.

Entergy applied to the supreme court for permission to appeal pursuant to Ark. R. App. P.–Civ. 2(f). The supreme court granted permission on February 29, 2019, and, as required by Rule 2(f)(3), Entergy filed a notice of appeal with the circuit clerk within ten days of the supreme court's order. The case was administratively transferred to this court on April 2, 2019.

## II. *Standard of Review*

A circuit court has broad discretion in matters pertaining to discovery, and the exercise of that discretion will not be reversed on appeal absent an abuse of discretion that is prejudicial to the appealing party. *Francis*, 2018 Ark. App. 250, at 11, 549 S.W.3d at 369. To have abused that discretion, the circuit court must have not only made an error in its decision, but also must have acted improvidently, thoughtlessly, and without due

14

consideration. *Id*. Additionally, when parties argue errors of law, this court reviews the issue de novo, recognizing that an error of law "in and of itself can also constitute an abuse of discretion." *Marks v. Saville*, 2017 Ark. App. 668, at 6, 550 S.W.3d 1, 5.

### III. *Discussion*

Entergy raises three arguments challenging the circuit court's order. First, Entergy contends that the circuit court erred by ruling that the law-of-the-case doctrine precluded revisiting the question of whether the attorney-client privilege and the work-product rule protected the root-cause evaluation reports from disclosure. Entergy asserts that the law-of-the-case doctrine only applies to bar reconsideration of matters in "a single, continuing lawsuit" and that "Ms. Allen was not a party in *Francis*, and her case was a lawsuit that was wholly separate from the litigation in *Francis*."

Second, Entergy argues that the circuit court erred by refusing to consider the new evidence that it offered to demonstrate that the root-cause evaluation reports were privileged. The circuit court's conclusion that it lacked jurisdiction to consider the evidence was erroneous, Entergy says, "because proper application of the law-of-the-case doctrine requires analyzing whether the new evidence materially varies from the evidence that was before the court in the earlier proceeding."

Third, Entergy contends that even if the law-of-the-case doctrine can be applied in these circumstances, "it would not apply in the manner that Ms. Allen argues." According to Entergy, our decision in *Francis* entitled only Bigge—and not any of the plaintiffs—to

the production of the root-cause evaluation reports. [3] While we agree that the law-of-the-case doctrine does not apply in these circumstances, we affirm the circuit court's discovery order.

A. Law of the Case

"The doctrine of law of the case prohibits a court from reconsidering issues of law and fact that have already been decided on appeal." *Green v. George's Farms, Inc.*, 2011 Ark. 70, at 7, 378 S.W.3d 715, 720. "The doctrine provides that a decision of an appellate court establishes the law of the case for the trial upon remand and for the appellate court itself upon subsequent review." *Id.* Law of the case "serves to effectuate efficiency and finality in the judicial process, and its purpose is to maintain consistency and avoid reconsideration of matters once decided in the course of a single, continuing lawsuit." *Id.*

Entergy is quite correct that the law-of-the-case doctrine does not apply in this case. While *Francis* addressed the same root-cause evaluation reports and the same claims of privilege against their disclosure, we did not make that decision in the course of the same lawsuit in which Allen filed her motion to compel. The cases—and the parties seeking the root-cause evaluation reports—are different. Accordingly, despite the similarity of the issues, we must agree that the circuit court was mistaken to the extent that it applied the law-of-

---

[3]Entergy does not appear to argue, as it did in *Francis*, that we should reverse the circuit court's order because Allen was not a "discovering party" entitled to file the motion to compel. That is for good reason. The record here demonstrates that Allen propounded interrogatories and requests for production that requested that Entergy produce "any internal correspondence, investigations, reports, or documents in relation to the question of liability for the occurrence on March 31, 2013" as well as correspondence between Entergy "and the Nuclear Regulatory Commission regarding the crane collapse[.]"

16

the-case doctrine to rule that *Francis* precluded reconsideration of Entergy's claims of privilege.

Even so, we "may affirm a circuit court where it has reached the right decision, albeit for the wrong reason," *Ark. State Bd. of Election Comm'rs v. Pulaski Cnty. Election Comm'n*, 2014 Ark. 236, at 12, 437 S.W.3d 80, 87. In this case, the doctrine of collateral estoppel— a close cousin of law of the case—is the more apt concept to preclude Entergy from relitigating its claims of privilege.  Unlike law of the case, collateral estoppel "may bar a party from relitigating an issue decided against it in a later and different case." 1 Carmody-Wait, *Cyclopedia of New York Practice* § 2:358 (2d ed.), *available at* CW2D § 2:358 (WL Feb. 2021 update). Indeed, the elements of collateral estoppel expressly concern issues adjudicated in separate proceedings, providing that the doctrine is established if (1) the issue sought to be precluded is the same as that involved in the prior litigation; (2) the issue was actually litigated in the prior proceeding; (3) the issue was determined by a final and valid judgment; and (4) the determination was essential to the judgment. *Winrock Grass Farm, Inc. v. Affiliated Real Estate Appraisers of Ark., Inc.*, 2010 Ark. App. 279, at 10, 373 S.W.3d 907, 914.  Collateral estoppel also "does not require mutuality of parties"; therefore, it is possible for a stranger to the first decree to assert collateral estoppel in a subsequent action.  *Id*. at 10, 373 S.W.3d at 913–14. Consequently, we apply the doctrine of collateral estoppel to determine whether the circuit court abused its discretion when it granted Allen's motion to compel.

Entergy suggests that we cannot apply collateral estoppel on appeal, however, because Allen did not invoke the doctrine during the proceedings below. We disagree.

17

It is not necessary for a party to use the words "collateral estoppel" to preserve its application on appellate review. *See Van Curen v. Ark. Prof'l Bail Bondsman Licensing Bd.*, 79 Ark. App. 43, 54, 84 S.W.3d 47, 55 (2002). Rather, it may be sufficient to simply rely on the previous decision that he or she claims has preclusive effect in the current litigation. *See id.* at 54, 84 S.W.3d at 55.

Here, Allen extensively argued that *Francis* precluded any further consideration of Entergy's claims of privilege. In her motion to compel, she attached the circuit court's March 13, 2017, order in *Francis* and argued that the circuit court had already ordered Entergy to produce the reports because "they are not subject to work-product immunity or attorney-client privilege." She also relied on this court's decision affirming the circuit court's order and argued that Entergy's refusal to produce the reports violated the appellate mandate. Further, Allen expressly invoked issue preclusion, or collateral estoppel, at the hearing on the motion to compel, again pointing to the decision in *Francis* and arguing as follows:

> It's res judicata. Res judicata has two parts, issue preclusion and claim preclusion. The issue of whether or not the document is privileged was decided. The issue of whether they were discoverable was decided. That's what the mandate provided.

Accordingly, we reject Entergy's suggestion that we cannot apply collateral estoppel on appeal because Allen failed to invoke the doctrine in the circuit court.

Entergy also asserts that collateral estoppel is not applicable here because it requires "that the issue must have been determined by a final and valid judgment," *Winrock*, 2010 Ark. App. 279, at 19, 373 S.W.3d at 914, and there was no final judgment on the merits of all the claims raised in *Francis*. Again, we disagree.

18

Whether the circuit court's discovery order qualifies as a final judgment for purposes of collateral estoppel appears to be a matter of first impression in Arkansas. Our supreme court has turned to the *Restatement (Second) of Judgments* in several cases regarding collateral estoppel, *see, e.g.*, *Beaver v. John Q. Hammons Hotels, L.P.*, 355 Ark. 359, 367, 138 S.W.3d 664, 559 (2003), and we find it instructive here. It provides that for purposes of collateral estoppel, "[a] 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." *Restatement (Second) of Judgments* § 13 (Am. L. Inst. 1982). Consequently, "that the parties were fully heard, that the court supported its decision with a reasoned opinion, that the decision was subject to appeal or was in fact reviewed on appeal, are factors supporting the conclusion that the decision is final for the purpose of preclusion." *Restatement (Second) of Judgments* § 13 cmt. g.

The circuit court's order resolving the discovery dispute in *Francis* meets all of these criteria for finality. Entergy's claims that the root-cause evaluation reports were protected by the attorney-client privilege and the work-product rule were fully heard. Entergy raised the claims in a motion for protective order, and the circuit court heard the motion at a hearing on February 28, 2017. The circuit court's order set forth its reasons for denying the motion for protective order, and the supreme court granted Entergy permission to appeal. Moreover, as set forth above, this court reviewed—and affirmed—the circuit court's order. We hold, therefore, that there is indeed a "final judgment" on the issue of whether the reports are privileged.

19

The record also supports the other elements of collateral estoppel. "In the context of collateral estoppel, 'actually litigated' means that the issue was raised in pleadings, or otherwise, that the defendant had a full and fair opportunity to be heard, and that a decision was rendered on the issue." *Powell v. Lane*, 375 Ark. 178, 186, 289 S.W.3d 440, 445 (2008). The same facts underpinning the finality of the judgment in *Francis*—the pleadings, hearing, and appeal—also establish that Entergy's claims were actually litigated there. Moreover, the issue litigated in this case—whether the root-cause evaluation reports were created in anticipation of litigation and therefore subject to attorney-client and work-product protection—is the same issue that was litigated in *Francis*. Finally, the circuit court's rejection of Entergy's invocation of the attorney-client privilege and work-product rule was essential to its order directing Entergy to produce the reports in *Francis*. We therefore hold that Entergy is precluded from raising those claims again here.

## B. New Evidence

We likewise reject Entergy's assertion that the circuit court abused its discretion by refusing to consider purported "new" evidence to support its claim that the root-cause evaluation reports were created in anticipation of litigation. While Entergy makes that argument in the context of its challenge to the doctrine of law of the case, we discuss it here because the availability of new evidence may also impact the application of collateral estoppel. *See Martin v. Rosenzweig*, 894 N.Y.S.2d 228, 230 (N.Y. App. 2010).

The additional evidence that Entergy offered below does not prevent the application of collateral estoppel in this case. Indeed, new evidence cannot defeat collateral estoppel unless it was unavailable while the prior case was pending, *see Ryan v. New York Tel. Co.*,

478 N.E.2d 487, 492 (N.Y. 1984), and Entergy has not claimed or demonstrated that its new evidence was unavailable when it pursued the protective order in *Francis*.

The evidence, moreover, was available. It included affidavits and deposition testimony from lawyers and Entergy employees who participated in the root-cause evaluations, and presumably, could have offered more comprehensive testimony about the nature of the reports in *Francis*. Indeed, one of the affidavits that Entergy offered as new evidence in *Allen* was a *supplemental* affidavit from one of the witnesses whose testimony the circuit court considered in *Francis*, which demonstrates that the contents of the new affidavit—if it had suited Entergy's legal strategy at the time—was previously available. *See Francis*, 2018 Ark. App. 250, at 17–18, 549 S.W.3d at 371–72 (refusing to consider the second affidavit from Entergy's outside counsel because it was not offered in a timely manner). Accordingly, we affirm the order granting Allen's motion to compel in this case because Entergy is collaterally estopped from relitigating those issues.

## IV. *Conclusion*

While we agree that the discovery decision in *Francis* cannot be law of the case here, we hold that the circuit court did not abuse its discretion when it ruled that *Francis* barred further consideration of Entergy's renewed claims of attorney-client privilege and the work-product protection. The doctrine of collateral estoppel, which Allen raised below and is supported by the record, bars Entergy from relitigating those claims.

Affirmed.

KLAPPENBACH and BROWN, JJ., agree.

21

*Quattlebaum, Grooms & Tull*, by: *Steven W. Quattlebaum*, *Michael N. Shannon*, and *Michael B. Heister*; and *Wright, Lindsey & Jennings*, by: *Gordon S. Rather, Jr.*, *Michael Barnes*, and *Kyle Wilson*, for appellants.

*Bailey & Oliver Law Firm*, by: *Sach D. Oliver*, *Frank H. Bailey*, and *T. Ryan Scott*, for appellee.